UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

DEBORAH ROWE,          )
                               )
     Plaintiff,          )
                               )        No. 5:16-CV-313-REW
v.                            )
                               )      OPINION AND ORDER
NANCY A. BERRYHILL, Acting  )
Commissioner of Social Security,[1] )
                               )
     Defendant.      )
                               )

\*\*\* \*\*\* \*\*\* \*\*\*

The Court considers cross-motions for summary judgment under the District's standard briefing protocol. Plaintiff/Claimant, Deborah Rowe, by counsel, appeals the Commissioner's denial of Title II disability insurance benefits.[2] The Court **GRANTS** the Commissioner's motion (DE #21) and **DENIES** Rowe's motion (DE #19). The ALJ adequately justified his weighing of the various medical opinions, and substantial evidence supported his RFC formulation, other factual determinations, and ultimate decision.

## I.    Relevant Facts and Procedural Overview

Rowe filed for a Title II period of disability and disability insurance benefits on October 17, 2012, alleging a disability beginning on October 12, 2012. R. at 40. She claimed that macular degeneration, IBS, phonic processing disorder, fibromyalgia, sleep apnea, fatty liver, neck pain, muscle spasms, depression, ADD, PTSD, osteoarthritis, and GERD, among other ailments,

---

[1] The Court substitutes Nancy A. Berryhill as the current Acting Commissioner of Social Security, per Fed. R. Civ. P. 25(d).
[2] The Court assesses Title II claims under familiar, generally applicable social security standards. *See, e.g.*, *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 957-58 (6th Cir. 2015).

foreclosed her ability to work. R. at 244. In February 2013, the Social Security Administration

denied her initial claim for benefits. R. at 106-128. On reconsideration in July 2013, the

Administration again denied the claim. R. at 129-152.  Upon Rowe's request pursuant to Part

404, Administrative Law Judge (ALJ) Jonathan Stanley conducted a video hearing on October

21, 2014. R. at 37-62. Vocational Expert Robert G. Piper also testified at the hearing. Following

the hearing, the ALJ determined that Rowe was not under a disability during the relevant period

and denied her claim. *Id.* The Appeals Council denied Rowe's request for review, precipitating

the instant Complaint. R. at 1; DE #1 (Complaint).

In evaluating Rowe's disability claim, the ALJ conducted the recognized five-step

analysis. 20 C.F.R. § 404.1520. The ALJ first determined that Rowe had not engaged in

substantial gainful activity, a defined term, since October 12, 2012, the alleged onset date. R. at

42.[3] Next, the ALJ found that Rowe established nineteen severe impairments: (1) obesity; (2)

degenerative disc disease of the cervical spine with cervicalgia/radiculopathy, status post fusion

at C3-4, C5-6, and C6-7; (3) degenerative disc disease of the thoracic spine with pain; (4)

degenerative disc disease of the lumbar spine with pain; (5) paresthesia of the upper extremities

by report; (6) degenerative joint disease of the left hip with bursitis; (7) degenerative joint

disease of the left knee with pain; (8) history of right foot pain; (9) fibromyalgia; (10)

osteoarthritis by report; (11) asthma; (12) bipolar disorder; (13) major depressive disorder, not

otherwise specified; (14) PTSD; (15) anxiety; (16) panic disorder by report; (17) ADHD; (18)

personality disorder, not otherwise specified; and (19) memory loss. *Id.* The decision

characterized and discussed twenty-four other impairments as non-severe. R. at 43-46. In the

---

[3] The ALJ determined also that Rowe met the insured status requirements of the Social Security
Act through December 31, 2016.

third step, the ALJ determined that Rowe's multiple impairments did not "meet[] or medically equal[] the severity of one of the listed impairments[.]" R. at 46. In assessing Rowe's residual functional capacity (RFC), the ALJ concluded that Rowe had the capacity "to perform light work . . . [and from] a *mental* standpoint, she can understand, remember, and carry out short simple instructions and make simple work-related judgments." The ALJ made other specific findings as to Rowe's RFC. R. at 48-56. The ALJ next (step 4) found Rowe "unable to perform any past relevant work" based on the vocational expert's testimony. R. at 56. Under the final step, the ALJ found (taking into account the vocational expert's testimony) that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to the other work that exists in significant numbers in the national economy." R. at 57. The ALJ thus concluded that Rowe had not been under a disability, during the relevant period,[4] as defined in the Social Security Act, and denied the application for disability benefits and disability insurance benefits. *Id.*

Rowe, by counsel, timely filed for review with the Appeals Council, which denied review. Plaintiff subsequently filed the instant action for judicial review pursuant to 42 U.S.C. § 405(g). Rowe now moves for summary judgment, contending that the ALJ erred in evaluating the opinions of Claimant's treating physician and two examining medical sources and erred in failing to consider a diagnosis of borderline intellection functioning as an impairment when determining Rowe's RFC. The Commissioner filed a cross-motion for summary judgment. The motions stand ripe and ready for review. The Court has carefully evaluated the briefing and full record.

---

[4] The relevant period is between the alleged onset date of October 12, 2012, and the date of the ALJ decision, February 13, 2015.

## II.     Standard of Review

Judicial review pursuant to § 405(g) is narrow. The Court confines itself to determining whether substantial evidence supported the ALJ's factual rulings and whether the Secretary properly applied the relevant legal standards. 42 U.S.C. § 405(g); *see also Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679 (6th Cir. 1989) (citing *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). Per the Social Security Act's express terms, the Commissioner's findings are conclusive as to any fact supported by substantial evidence. 42 U.S.C. § 405(g); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). Substantial evidence is more than a mere scintilla and is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston*, 245 F.3d at 534 (quoting *Perales*, 91 S. Ct. at 1427); *see also Osborne v. Colvin*, No. 0:13-CV-174-EBA, 2014 WL 2506459, at *3 (E.D. Ky. June 3, 2014) (applying standard).

Given the limited nature of substantial evidence review, the Court does weigh matters *de novo*, make credibility determinations, or resolve conflicts in the evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). Indeed, if substantial evidence exists to support the ALJ's decision, the reviewing court must affirm the ALJ "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citations and internal quotation marks omitted). The deferential standard creates for the Commissioner a "zone of choice," which, in the presence of adequately supportive evidence, is immune from Court interference. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). The Commissioner must, however, comply with the Agency's own procedural rules, and a prejudicial deviation from

requisite procedures warrants remand. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

The ALJ's opinion was thorough, exhaustive, and fully compliant with the applicable law. Despite the numerical torrent of impairments, the ALJ carefully and expertly parsed the record and made a well-defended and reasonable decision counter to Rowe, which the Court here upholds.

## III. Analysis

1. *The ALJ did not commit reversible error in assigning weight to Dr. Ellis's April 2014 assessment.*

Rowe first argues that the ALJ "violated 20 CFR § 404.1527[(c)(2)] by failing to state good reasons for rejecting the uncontradicted medical opinion from" treating source, Dr. Ellis. DE #19-1, at 8. In his ruling, the ALJ stated:

> Likewise, some weight is ascribed the **treating source statement of attending family physician Brian Ellis, M.D. (19F)**, because his spartan finding of the claimant's inability to perform even a reduced range of sedentary work for 8 hours per day is patently incongruous with the overwhelming body of contradictory medical evidence encompassing exam findings (including his own), diagnostic test results, and correspondingly conservative treatment, in addition to details of the claimant's largely independent married lifestyle – all of which have been discussed and cited in detail above.

R. at 54-55. Rowe's critique centers on the ALJ giving the opinion merely "some weight," "without explaining what weight was give[n] or the reasons for giving [the] opinion 'some weight.'" DE #19-1, at 10-11 (emphasis removed). The Commissioner defends the ALJ's reasoning as adequate under the implementing rules and regulations.

"An ALJ gives 'controlling weight' to a treating physician's opinion if the opinion 'is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Maloney v.*

*Comm'r of Soc. Sec.*, 480 Fed. App'x 804, 808-09 (6th Cir. 2012). The Sixth Circuit has stated

the contours of the treating physician rule:

> The agency promises claimants that it will give more weight to the opinions of treating sources than to non-treating sources. 20 C.F.R. § 404.1527(d). The opinions of treating physicians carry more weight because they likely provide "a detailed, longitudinal picture" of the claimant's medical impairment(s) that cannot be obtained from objective medical findings alone or from reports of consultants' examinations. *Wilson*, 378 F.3d at 544. An ALJ must give a treating source opinion concerning the nature and severity of the claimant's impairment controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d at 406. However, a doctor's opinion that a patient is disabled from all work may invade the ultimate disability issue reserved to the Commissioner and, while such an opinion could still be considered, it could "never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) ("Medical sources often offer opinions about whether an individual . . . is 'disabled' or 'unable to work[.]' . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner."); 20 C.F.R. § 404.1527(e)(1).
>
> If the ALJ decides not to give a treating physician's opinion controlling weight, the ALJ may not reject the opinion but must apply other factors to determine what weight to give the opinion, such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source[.]" *Wilson*, 378 F.3d at 544 (citing § 404.1527(d)(2)). If benefits are denied, the ALJ must give "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); [*Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)] (citing Rule 96-2p for the proposition that all cases carry a rebuttable presumption that a treating physician's opinion "is entitled to great deference, its non-controlling status notwithstanding").

*Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 437 (6th Cir. 2013). To justify giving a treating

physician's opinion "less than controlling weight," the ALJ must state "good reasons." *Id.*

"'Good reasons'" are those "'supported by the evidence in the case record'" and "'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and reasons for that weight.'" *Melton v. Astrue*, No. 11-305-KSF, 2012 WL 1933731, at *3 (E.D. Ky. May 29, 2012) (quoting *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011)). If the ALJ fails to articulate good reasons for rejecting the treating physician's opinion, the reviewing court must reverse and remand to the Commissioner, "even if substantial evidence otherwise exists in the record to support the Commissioner's decision." *Mitchell v. Comm'r of Soc. Sec.*, 330 Fed. App'x 563, 569 (6th Cir. 2009); *see also Wilson*, 378 F.3d at 543 ("Because the ALJ, by failing to articulate reasons for discounting the opinion of Wilson's treating physician, violated the agency's own procedural regulation, we vacate the judgment of the district court affirming the ALJ decision and remand for further proceedings consistent with this opinion.").

Dr. Ellis's April 2014 opinion provides the following prognosis: "Poor for ability to obtain/retain gainful employment due to limited ability to lift/carry, bend, squat, do desk work/computer work (due to her neck, shoulder [and] back pain), poor for ability to do any job requiring repetitive physical activity or remembering details." R. at 740. He describes Rowe's pain as "moderate to severe" and "constant, aching in nature . . . in neck, shoulders, low back, hips [and] legs." R. at 741. The doctor viewed Rowe as unable to sit more than 4 hours or stand/walk more than 2 hours in an eight-hour period. R. at 743. Ellis further found that Rowe exhibited "a lot of trouble w/decreased memory" related to complaints of "poor short-term memory [and] trouble concentrating." R. at 740-41. As the objective bases for his opinion, Dr. Ellis cited a June 18, 2010, MRI of the lumbar spine, a March 28, 2011, MRI of the cervical spine, the 2011 records from Dr. Robert Knetsche of the Central Kentucky Spine Center, and "multiple years" of records from Comprehensive Care Counseling. R. at 740.

Here, Rowe argues that the ALJ improperly gave Dr. Ellis's opinion "'some weight,' without explaining what weight was give[n] or the reasons for giving [the] opinion 'some weight.'" DE #19-1, at 10-11. Contrary to this assertion, however, the ALJ listed multiple good reasons (*i.e.*, record-based and fully reviewable) for discounting the treating physician's opinion, following an extensive review of the entire record including Dr. Ellis's treatment notes over the full span. He gave four reasons: Ellis's conclusory April 2014 opinion on Rowe's inability "to perform even a reduced range of sedentary work" was "patently incongruous with the overwhelming body of contradictory medical evidence" including (1) "exam findings (including [Ellis's own])," (2) "diagnostic test results," (3) "conservative treatment" plans for various impairments, and (4) "claimant's largely independent married lifestyle." R. at 54-55. The ALJ specifically incorporated by reference the prior extensive negative analysis of Rowe's subjective credibility and the medical evidence pertaining to Rowe's physical and mental impairments. *See* R. at 55 (stating that all reasons for discounting Dr. Ellis's opinion "have been discussed and cited in detail above"); *see also* R. 48-54 (RFC discussion specifically analyzing in distinct subsections "Subjective Credibility," "Medical Evidence Pertaining to Severe Physical Impairments," and "Medical Evidence Pertaining to Severe Mental Impairments").

As cited by the ALJ, the record contains ample evidence supporting the clearly stated reasons for discounting Dr. Ellis's opinion. Indeed, the medical proof in the record, including Ellis's own, and those of his practice, Danville Family Physicians, reasonably belies the extremity of his limitation findings. Rowe often presented as unremarkable for "clinical indicia of neurologic, musculoskeletal, cardiopulmonary, or systemic abnormalities" corroborative of her complaints of disabling obesity, degenerative disc disease in the neck and back, degenerative joint issues in the hip and knee, foot pain, or fibromyalgia. R. at 51 (ALJ report summarizing

physical exam findings); *see, e.g.*, 666, 670, 766 (multiple visits post-neck fusion surgery noting "No Acute Distress," "ROM of the cervical spine is full," "good spirits"). Following Rowe's cervical fusion procedure in November 2011, records indicate "zero" complications with no "abnormalities" and "unremarkable" soft tissue surrounding the fusion site. R. at 325, 464. In fact, during a February 2012 follow-up, Rowe stated she "is quite happy and reports she would undergo the surgery again if needed." R. at 385. She was working up to seventy-hour weeks in June 2012. R. at 373.

Additionally, the of-record diagnostic testing contradicts or does not well-support Ellis. In response to complaints of pain, Rowe underwent various MRIs and other imaging. Post-operative x-rays of the neck showed "normal cervical curvature" and "no signs of hardware loosening." R. at 385. Lumbar scans from 2010 indicate "early degenerative disc disease" with "[n]o significant disc bulge or protrusion." R. at 586. Similarly, scans of Rowe's left knee and left hip showed no abnormalities. R. at 456, 584. Nerve conduction testing related to a potential fibromyalgia diagnosis in September 2014 "produced negative studies without electromyographic evidence of radiculopathy or myopathy in the upper or lower extremities." R. at 858.

Further, with regard to the finding of memory loss and the attendant limitations included in Ellis's opinion, the objective evidence indicates only mild impairment. The general basis of Ellis's finding appears to be Rowe's January 2014 complaint of memory loss in a visit with APRN King. R. at 664. These notes include a vague reference to 2004 testing by a psychologist (perhaps Dr. Timothy Carbary's September 22, 2004 exam, *see* 843-48). *Id.* Dr. Ellis referred Rowe to a neurologist, Dr. Deepa Nidhiry, for further testing, which yielded brain scans negative for any abnormality. R. at 746, 786. Dr. Ndihiry administered an MMSE (mini-mental status

exam), which, per the ALJ, indicated "'mild' cognitive impairment with specific regard to reported memory loss." R. at 53, 746 (premised on MMSE score of 26/30). Rowe does not contest this characterization by the ALJ.

Perhaps the ALJ could have provided more factorial detail in his handling of Dr. Ellis's report, but his discussion effectively covered the regulatory requirements. Thus, he plainly accounted for the full medical history, and thus the length of treatment, as shown by his detailed references to documents and Ellis's own treatment notes within the full span. He lodged specific, record-based criticisms built on inconsistencies between Ellis's April 2014 report, the overall medical record, and Ellis's own specific practice records. Finally, he contrasted the grave limitations of profound disability Ellis suggested—which the doctor based on little if any current objective diagnostic tools—with what the ALJ observed about Rowe's abilities and what the overall record showed about her abilities. A few stark examples emerge in the Court's view. Ellis's vastly disabling portrayal from April 2014 contrasts sharply with office visits from just before and just after that date. *See* R. at 702 (January 2014 Ellis visit, with Review of Systems "All Negative" as to the musculoskeletal system and with neurologic report as "Alert and Oriented x 3" and "calm, cooperative, with normal mentation"); R. at 766 (July 2014 Ellis visit, with similar "All Negative" report as to the musculoskeletal system).

The ALJ properly critiqued the supportability of Dr. Ellis's views and the consistency of those views across the entire record.[5] As against Ellis's mental observations, the ALJ had before him a claimant that, testifying directly as an "effective historian," R. at 47, had without assistance completed all disability forms, had engaged a field representative without any evident

---

[5] The ALJ found substantial contrary proof, and proof reasonably and directly supporting his RFC formulation, in the opinions of Drs. Waltrip (Exhibit 8F), Wiener (R. at 123), and Vandivier (R. at 140). *See* R. at 51, 54 (ALJ discussion).

mental difficulty, had held a post-high school degree and a position requiring state licensure, and lived actively (with camping as a hobby) and independently. Without rotely enumerating every § 404.1527 opinion-weighing factor, the ALJ effectively accounted for those factors in his thorough and encyclopedic work, including in his handling of Dr. Ellis's views. *See Machiele v. Comm'r of Soc. Sec.*, No. 1:14-CV-624, 2014 WL 4080240, at *1 (W.D. Mich. Aug. 18, 2014) (noting "there is no requirement that the ALJ address each of the § 404.1527(c) factors in her opinion" and defining adequacy by the *Gayheart*[6] standard). Simply put, with plenteous detail, the ALJ sharply discounted Dr. Ellis's "spartan" finding as "patently incongruous with the overwhelming body of contradictory . . . evidence." R. at 54. This well-supported conclusion passes muster under the standard. The ALJ cited specific parts of the record to support his detailed criticism of Dr. Ellis's report, and the discussion adequately explained and allows adequate assessment of the ALJ's take. This satisfies the rubric and survives review. *See Gayheart*, 710 F.3d at 376 (noting requirement, based on § 404.1527, of "'good reasons' for discounting the weight given to a treating-source opinion. . . . These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" (quoting SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996))); *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012) ("So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review.").[7]

---

[6] *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2015).

[7] Rowe further criticizes for vagueness the ALJ's use of the phrase "some weight" in delineating the treatment of Dr. Ellis's opinion. DE #19-1, at 10. Rowe claims the ALJ "never explains what weight is actually given to the long-term treating primary care physician." *Id.* It was not improper for the ALJ to use the term "some weight." He plainly rejected controlling weight, and

Rowe next alleges that the ALJ erroneously, and without sufficient explanation, assigned only "some" weight to two examining psychologists, Drs. Fishkoff and Anderson. DE #19-1, at 10. Per Rowe, "the ALJ failed to explain what he meant by 'some weight.'" *Id.* Ultimately, Rowe criticizes, as inadequately supported, the ALJ's "decision to discredit . . . the supportive, disabling opinions in the record," claiming the weight given "is without basis." *Id.*

The implementing Social Security regulations describe 6 factors the Agency uses to "weigh medical opinions." 20 C.F.R. § 404.1527(c)(1)-(6). Said factors include the examining relationship, treatment relationship, the length of treatment relationship and exam frequency, the nature and extent of the treatment relationship, consistency of the opinion as compared to the overall record, specialization, and other indicia of opinion validity. *Id.* With respect to the examining relationship, the regulation states: "Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.* § 404.1527(c)(1). However, unlike a supported treating source, an examining physician's

---

he explained the particular criticisms leading to his rejection of the degree of restrictions Dr. Ellis indicated. Such language is recognized in the cases as a valid expression, in the context of a complete decision, regarding weight assigned. *See Franklin v. Astrue*, 450 F. App'x 782, 786 (10th Cir. 2011) (discussion approving consideration given as "some, but not great"). In addition to the four reasons analyzed above, the ALJ clearly rejects Dr. Ellis's opinion to the extent it conflicts with the determined RFC of modified light work with attendant mental capacity limitations. R. at 50 ("This phenomenon, in conjunction with daily activities, strongly suggests a lack of significantly disabling impairment at alleged onset, and concomitantly, the claimant's continued ability to work, at least to the level of significantly restricted light exertion proposed by the RFC."); *id.* ("The medical evidence is equally unpersuasive for physical limitations that exceed the RFC's qualified light work."); R. at 52 ("The evidence of mental health care fails to endorse restrictions that eclipse the RFC."); R. at 54 (rejecting Ellis's opinion to the extent he finds Rowe unable "to perform even a reduced range of sedentary work," *i.e.*, a greater level of disability than recognized in the RFC's modified light work restrictions). Read in the context of the decision as a whole, the ALJ "make[s] clear . . . the weight the adjudicator gave to the treating source's medical opinion and reasons for that weight." *Melton*, 2012 WL 1933731, at *3.

opinions "are not entitled to any special deference." *Wesley v. Comm'r of Soc. Sec.*, 205 F.3d 1343, at *6 (6th Cir. 2000) (table) (citing *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). Still, "[i]n weighing opinions of non-treating sources, Social Security regulations require the ALJ to apply the same level of scrutiny as afforded to treating source opinions. 'A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation[s] require[].'" *Lewis-Money v. Comm'r of Soc. Sec.*, No. 3:14CV261, 2015 WL 4465328, at *6 (S.D. Ohio Sept. 28, 2015) (quoting *Gayheart*, 710 F.3d at 379). Thus, the ALJ "should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Dr. Fishkoff completed a mental status examination on January 16, 2013. R. at 555. During an exam that involved interacting with Rowe and administering various tests, Dr. Fishkoff observed her to have "goal-directed, clear and coherent" thought content and speech and noted that Rowe complained of "classic symptoms of depression and anxiety" and "panic attacks one to two times a week." R. at 556-57. Dr. Fishkoff further noted that Rowe denied a "history of impaired interpersonal relationships within the workforce" and observed Rowe "to have adequate coping skills, based on her work history and intellectual functioning." R. at 557, 559. Dr. Fishkoff opined, based on the administration of the WAIS-IV, that Rowe "presents with borderline intellectual functioning given her deficits in working memory and processing speed" with an impaired ability "to tolerate frustration [and] conform to social standards" and "sustain attention to perform simple and repetitive tasks." R. at 560. Dr. Fishkoff concludes that Rowe

"does not appear to be capable of tolerating the stress and pressures associated with day-to-day work activity." R. at 561.

Dr. Anderson, evidently not in the loop as to the pending benefits claim, completed a "neuropsychological evaluation" on July 23, 2014, on referral from another medical provider during Rowe's course of treatment. R. at 760. Dr. Anderson observed Rowe to have "somewhat slowed speech" but otherwise she presented with "no frank difficulties in receptive language, practical spatial functions, attention, and/or gait/fine motor skills." R. at 761. Rowe gave "impersistent" effort on various tests, which indicated "likely symptom exaggeration" based on "formal and embedded measures of effort and symptom validity." *Id.* As a result, the diagnostic testing was largely invalid. *Id.* Dr. Anderson did opine that "Rowe's current presentation is [likely] rooted in chronic posttraumatic stress disorder related to abuse in both childhood and adulthood." R. at 762. Ultimately, Dr. Anderson recommended treatment along the lines of "straightforward cognitive-behavioral approaches with a focus on mindfulness, relaxation, emotional regulation, and practical skills." R. at 763. Dr. Anderson stated "long-term treatment will very likely be required due to the chronic nature of the patient's symptoms[,]" but she did not recommend any "urgent follow-up with the Neurocognitive team." R. at 763. The psychologist noted no specific limitations as to Rowe's abilities relative to employment or work functions.

In evaluating the examining psychologists' opinions, the ALJ considered the appropriate factors as required by Administration regulations. While Rowe argues that the ALJ "failed to explain what he meant by 'some weight'" when analyzing the opinions, DE #19-1, at 10, the ALJ, in fact, provided ample information about and reasons for the weight assigned. As to Dr. Fishkoff, the ALJ rejected the severity of her findings as correlating "only with strong subjective

allegations," and "with little rational relationship" to Rowe's independent married lifestyle, her treatment records, and especially Dr. Fishkoff's "true clinical observations." R. at 54. Dr. Fishkoff's diagnoses of depression, PTSD, anxiety, and ADHD largely centered, from her report, on Rowe's subjective statements. R. at 555-57 (Rowe "indicated" phonic processing disorder, "did endorse" symptoms of depression, anxiety, and frequent panic attacks, "did indicate" flashbacks). As the ALJ stated in his critical review of her opinion, Dr. Fishkoff's objective findings do not rise to the total incapability to tolerate day-to-day work activity suggested. R. at 556-58 (ability to "read[] on a high school level," "able to recall to two sets of three digits forward and two sets of two digits in reverse," and "able to express herself in an adequate manner").

With respect to the validity of Rowe's subjective complaints, the ALJ's decision sets out ample reasons to discount "the intensity, persistence and limiting effects of these symptoms" as not entirely credible. R. at 48-50 (citing, in the record, "an array of physical, daily, public, and cognitive activities commensurate with successful performance of the considerably limited light work delineated by the RFC" and also recounting the ALJ's own personal observations during the administrative hearing); *see, e.g.*, R. at 241 (agency field representative, as to face-to-face interview, observing no issues with understanding, concentrating, talking, sitting, standing, or walking); 524, 582, 666 (multiple visits with treating physician exhibiting "no acute distress"). Critically, Rowe had reported that in October 2012, when she stopped working, she ceased primarily due to the death of the patient for whom she cared. R. at 245, 555; R. at 72 ("Q: Why did you leave that employment? A: She had passed away."). Thus, at alleged onset, and a mere three months before the Fishkoff evaluation, Rowe ostensibly was fully able to work and thwarted only by the passing of her charge. The ALJ considered this a critical, contemporaneous

credibility element that infected the overall record. Given that Fishkoff's report largely details subjective complaints, the ALJ's view of Rowe's underlying credibility and her exaggeration of symptoms (seen too by Anderson) rationally impacts the weight given Fishkoff's opinion. Viewed in light of the largely unremarkable *objective* observations found in the psychologist's evaluation, the ALJ's decision to give only some weight to the opinion was justified and reasonable.

The ALJ paid exacting attention to what Dr. Fishkoff saw and how she described it. Thus, he perceived concerning disparity between her observations and her conclusions, calling the result a "highly problematic psychological consultative exam." R. at 54. Although he referenced her views throughout the report, *e.g.*, R. at 48, 56 (accounting for Fishkoff's statements), the ALJ ultimately treated the disabling conclusions as incongruous with Rowe's self-proclaimed and demonstrated abilities, things Fishkoff herself saw but undervalued in the ALJ's reasonable view. Fishkoff declared that Rowe read at a high school level, was capable of independent money management, held a valid driver's license, and had a history that included a leadership role in a mental health organization—all of which seemed to matter not when it came to the ultimate conclusions reached. Fishkoff assessed Rowe a mere three months after alleged onset, a time when Rowe was working full-time as a caregiver and ceased by virtue of her patient's demise—yet Fishkoff saw her as wholly unable to handle the mental demands of any employment. The ALJ perceived the disconnect as emptying the force from Fishkoff's report. This was not the only possible view of the record, but there is substantial evidence behind the ALJ's interpretations, and his analysis adequately tracks the decisional rubric.

As to Dr. Anderson, the Court first notes that Anderson's records do not contain any actual work limitations or opinions, likely because, as the ALJ noted, "Dr. Anderson does not

appear to be aware that the claimant has an ongoing Social Security disability claim." R. at 53. As such, Rowe's challenge to the ALJ's treatment of Anderson's opinions is somewhat opaque. Rowe cites the ALJ's use of Anderson's finding of symptom exaggeration as incomplete and "without basis." DE #19-1, at 10. Rowe claims the ALJ "ignored Dr. Anderson's finding that Rowe's presentation is 'rooted in chronic posttraumatic stress disorder.'" *Id.* This misstates the ALJ's decision. The ALJ noted the finding of PTSD and its possible relation to the symptom exaggeration. R. at 53. However, he expressly discounted the PTSD finding by comparing Dr. Anderson's diagnosis with an earlier psychological testing performed by Dr. Timothy Carbary, a psychologist, in 2004. *Id.* During that earlier testing, Rowe expressly denied any history of family abuse. R. at 844. Further, that testing yielded valid results,[8] which the ALJ reasonably inferred indicated further support that Dr. Anderson's diagnoses were tainted by Rowe's exaggerations. This was a sound and rational reason to view Anderson's overall input as doubtfully staked on a faulty historical premise.

The ALJ articulated appropriate and sufficient reasons for the weight assigned the psychologists' opinions. Further, substantial evidence supports the RFC determination. R. at 52-54. Even though discounting the exaggerated severity of symptoms, the ALJ found that Rowe's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 49. The RFC, reflecting a careful analysis of the extensive record, limits Rowe, from a mental standpoint, to carrying out simple instructions, making simple work-related judgments, and performing simple routine tasks with normal supervision. R. at 48. The ALJ arrived at these conclusions while considering the entire (medical and otherwise) record, the

---

[8] And, parenthetically, results far exceeding those from Fishkoff in terms of intellectual functioning. R. at 845 (low average to average).

medical opinions of the examining psychologists as noted, and the fact that Rowe "demonstrated the ability to hear and engage normal conversation" during first-hand observation at the hearing. R. at 49. Assessing record totality is an ALJ duty under the statute, and the ALJ carefully and exhaustively did that here. While Rowe would interpret the proof more severely and establish a totally disabling RFC, substantial evidence supports the ALJ's findings.

3. *The ALJ did not commit reversible error in failing to mention explicitly Dr. Fishkoff's diagnosis of borderline intellectual functioning.*

Lastly, Rowe argues that the ALJ erred by "never consider[ing] Borderline Intellectual Functioning as a severe or non-severe impairment. <u>The ALJ never mentioned Borderline Intellectual Functioning throughout his decision</u>. As a mental impairment objectively verified by valid test results, it is erroneous for the ALJ to exclude Borderline Intellectual Functioning in assigning Rowe's Residual Functional Capacity." DE #19-1, at 11-12 (emphasis in original). Rowe equates this failure to address the borderline intellectual functioning diagnosis from Dr. Fishkoff as a failure to consider all evidence in the case record, in violation of 20 C.F.R. § 404.1520(a)(3). *Id.* Rowe frames the issue, in part, as a failure to identify a "severe impairment." *Id.* at 11.

ALJ Stanley found nineteen severe impairments including the following severe *mental* impairments: bipolar disorder; major depressive disorder, not otherwise specified; PTSD; anxiety; panic disorder by report; ADHD; personality disorder, not otherwise specified; and memory loss. R. at 42. Though the ALJ outlined several other non-severe impairments at step two, he did not identify explicitly Rowe's alleged borderline intellectual functioning as either a severe or non-severe impairment. He did include memory loss as a severe impairment, and memory was a foundational part of Fishkoff's finding. R. at 560.

To the extent Plaintiff alleges ALJ failure at step two, the Sixth Circuit has rebuffed such arguments:

Pompa argues that the ALJ erred by finding that a number of her impairments were not severe under the regulations. However, the ALJ did determine that Pompa had at least one severe impairment. Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps. 20 C.F.R. § 404.1545(e). **Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence. As the ALJ considered all of Pompa's impairments in her residual functional capacity assessment finding, Pompa's argument is without merit.**

*Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (emphasis added). Here, too, the ALJ found that Rowe had at least one severe mental impairment (finding eight), and thus (and explicitly) considered all impairments in the subsequent steps. *See* R. at 48 (noting the ALJ's "careful consideration of the entire record"); *id.* (the ALJ stating he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the . . . evidence"). "[I]t is well settled that[] an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (internal alteration omitted). Further, the "ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004).

Indeed, "the severity determination is 'a de minimis hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "The fact that" the ALJ did not consider borderline intellectual functioning as severe "at step two is therefore legally irrelevant." *Id.* (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). "The ALJ, therefore, did not commit reversible err in this regard." *Id.*; *see also, e.g.*, *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) ("[T]he failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe.").

Further, the general argument that the ALJ erred in failing specifically to address or mention Dr. Fishkoff's finding that Rowe exhibited borderline intellectual functioning garners no relief. DE #19-1, at 12. The SSA promises to "consider all evidence in your case record when we make a determination or decision whether you are disabled." 20 C.F.R. § 404.1520(a)(3). In determining disability, the SSA "will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." *Id.* § 404.1527(b). Here, while the ALJ did not reference the words "borderline intellectual functioning," he clearly considered Dr. Fishkoff's entire opinion, which contained that assessment. R. at 53, 54. As reviewed above in Section III.2, the ALJ properly considered and weighed Dr. Fishkoff's opinion, and substantial evidence supported the findings pertaining to same. Omission of textual reference to borderline intellectual functioning does not doom the decision or require reversal. *See Simons*, 114 F. App'x at 733. Any fair reading of the ALJ's treatment finds full and detailed awareness of the entire record, and the decision gave distinct and full attention to Fishkoff's complete report.

## IV.    Conclusion

Having considered the full record, and for the reasons discussed above, the Court **GRANTS** the Commissioner's motion for summary judgment (DE #21) and **DENIES** Rowe's motion for summary judgment (DE #19).[9] The Court will enter a separate Judgment.

This the 22d day of June, 2017.

---

[9] Not lost on the Court is the ALJ's detailed treatment of overall claim credibility. He plainly confronted a Claimant presenting literally dozens of physical and mental issues but who continued to live with sufficient independence and ability to pass the RFC threshold assigned by the ALJ. This led to perceptual issues of credibility, a prism through which the ALJ viewed the contested record. *See* R. at 45 (noting "prodigious battery of alleged impairments" and lack of substantiation for many as suggesting "posturing" that thereby "detracts from the credibility of her legitimate complaints").



**Signed By:**

*Robert E. Wier*

**United States Magistrate Judge**